STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

KELSEY C. DAVIDSON (CABN 322323)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6959
    Fax: (415) 436-7027
    kelsey.davidson@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:22-MJ-71504-MAG |
| Plaintiff, | **MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION FOR DETENTION** |
| v. | |
| FRANK RAMOS-ARTEAGA, | Date:    December 2, 2022<br>Time:   10:30 a.m.<br>Court:  Hon. Lisa J. Cisneros |
| Defendant. | |

# INTRODUCTION

The defendant, Frank Ramos-Arteaga, is a Honduran national who has repeatedly been arrested for narcotics related offenses over the last decade. The defendant sold narcotics to an undercover officer three times within a three-week period despite being on probation. This included significant quantities of fentanyl, a drug which the DEA has estimated that a mere two milligrams (0.002) can be lethal depending on a person's body size, tolerance, and past usage. The defendant frequents the Tenderloin and has often been observed dealing narcotics there. GPS tracking data and physical surveillance show that a vehicle associated with the defendant drove into San Francisco on twelve different days in a one-month period. SFPD officers observed the defendant in the Tenderloin—where he is suspected to be engaged in narcotics trafficking—on four of those days and on additional days that GPS tracking did not show his vehicle in San Francisco. The defendant is not discriminating, however, and also sells narcotics in Oakland.

The activities of the defendant and others who similarly peddle fentanyl and other drugs in San Francisco for a living have been deadly for the citizens of this city. In 2020 and 2021, approximately 1,300 people died from drug overdoses in San Francisco—nearly twice the number who died from COVID-19 over that same period. And about three quarters of those overdose victims—or about 1,000 people—had fentanyl in their systems.[1] The scourge continues in 2022, with San Francisco currently on pace to have nearly 600 overdose deaths by the end of this year.[2] In October alone, 43 people died from accidental overdoses, 33 of which involved fentanyl.[3] The area where the defendant sold his drugs is among the most seriously affected places in the city, prompting Mayor London Breed to declare a 90-day state of emergency in the Tenderloin and the surrounding area in late 2021.[4] As the Mayor stated in her

---

[1] Trisha Thadani, et al., *San Francisco's fentanyl crisis: A disaster in plain sight*, S.F. Chron., Feb. 2, 2022 (https://www.sfchronicle.com/projects/2022/sf-fentanyl-opioid-epidemic/).

[2] *See* Yoohyun Jung, *43 People Died in October in San Francisco from Accidental Overdoses*, S.F. Chronicle, https://www.sfchronicle.com/projects/2021/san-francisco-drug-overdoses-map/ (last updated Nov. 21, 2022).

[3] *Id.*

[4] Mayor London Breed Declares State of Emergency in the Tenderloin," Dec. 17, 2021, https://sfmayor.org/article/mayor-london-breed-declares-state-emergency-tenderloin). On December 23, 2021, the San Francisco Board of Supervisors voted to approve Mayor Breed's Emergency Declaration in the Tenderloin. *See* "Board of Supervisors Approves Mayor London Breed's State of Emergency Declaration in the Tenderloin," Dec. 23, 2021 (https://sfmayor.org/article/board-supervisors-approves-mayor-london-breed%E2%80%99s-state-emergency-declaration-tenderloin). The State of Emergency

announcement, the "rapidly deteriorating conditions in the Tenderloin caused by the opioid crisis put the lives of San Franciscans in serious risk."

The defendant must overcome a rebuttable presumption that no condition or combination of conditions will reasonably assure his appearance and the safety of the community. Here, he cannot do so. The government therefore requests that the Court order the defendant detained pending trial.

## FACTUAL BACKGROUND

### I. The Defendant Sold an Undercover Officer Narcotics on Three Separate Occasions

As described in more detail in the Complaint, the defendant sold an undercover officer methamphetamine and/or fentanyl three times from October 7 to October 27, 2022.

First, on October 7, 2022, an undercover officer approached the defendant in the Tenderloin and purchased 2.2 grams (net) of methamphetamine. The defendant gave the undercover officer his phone number to set up future buys.

Second, on October 11, 2022, the undercover officer contacted the defendant to purchase fentanyl and methamphetamine. On October 12, 2022, the defendant asked the undercover officer to come to Oakland, where the defendant then sold the undercover officer 56.02 grams (net) of methamphetamine and 28.72 grams (net) of fentanyl.

Third, on October 27, 2022, SFPD observed the defendant in the Tenderloin, and the undercover officer contacted him to arrange a narcotics purchase. The defendant agreed but, after seeing SFPD officers inside an unmarked van, text messaged the undercover officer to come to Oakland instead. The undercover officer went to Oakland where the defendant sold him 55.81 grams (net) of fentanyl and 58.3 grams (gross) of methamphetamine.

### II. The Defendant's Arrest Led to the Discovery of More Narcotics

On November 28, 2022, SFPD officers executed a warrant to arrest the defendant and search his car and three locations associated with him. The undercover officer arranged to purchase three ounces of fentanyl and three ounces of methamphetamine and met the defendant at an arranged location in Oakland. Prior to the purchase time, SFPD surveilled the defendant and observed him leave his apartment with a

---

was kept open for 90 days.

backpack before picking up his son and another individual and going to the buy location. When the defendant arrived, he was arrested and 143.8 grams (gross) of fentanyl and 106.8 grams (gross) of methamphetamine were found in his front sweatshirt pocket.[5]  Additionally, 141.5 grams (gross) of suspected Oxycodone and 52.9 grams (gross) of suspected Xanax was found in his backpack that the defendant was seen with earlier that day (and on other occasions). A search of his residence revealed 130.5 grams (gross) of suspected fentanyl, 356.4 grams (gross) of Xanax, and 80 grams (gross) of Oxycodone.[6]  Indicia of drug tracking were also found, including $401, numerous scales and plastic bags.

### III. The Defendant Has Previously Been Arrested on Narcotics Related Charges

Since 2012, the defendant has been arrested ten times (not including the instant offense) for narcotics related offenses. For example, in June 2014, the defendant was arrested in the Tenderloin and had 13.7 grams (gross) of base rock cocaine. Additionally, in June 2017, the defendant was at a residence in Oakland when a search warrant was executed. He was observed discarding narcotics out the window, including 6 baggies of heroin weighing 1.6 grams (gross), 18 baggies of methamphetamine weighing 5.2 grams (gross), and 74 baggies of cocaine base weighing 17.5 grams (gross). In June 2019, the defendant was again arrested for narcotics trafficking. He was utilizing another individual to hold a backpack with the narcotics as he made sales, which was seized when the defendant was arrested. The backpack had numerous baggies of drugs, including a total of 21 grams (gross) of cocaine base, 13.4 grams (gross) of heroin, 12 grams (gross) of methamphetamine, 35.9 grams (gross) of fentanyl, 6.5 grams (gross) of cocaine salt, and 9 Xanax pills. Similarly, in July 2019, the defendant was arrested for narcotics trafficking in the Tenderloin and was again using another individual to hold a backpack of narcotics. The backpack had numerous baggies of drugs, including a total of 12.3 grams (gross) of cocaine base, 16.5 grams (gross) of heroin, 2.7 grams (gross) of methamphetamine, 27.0 grams (gross) of fentanyl, and 8 pieces of broken unknown pills. He was also on probation at the time of the instant offense.

---

[5] The fentanyl found on his person and in his residence at the time of the arrest were tested with a TruNarc analyzer and tested presumptive clear, Mannitol. Mannitol is used by narcotics dealers as a cutting agent to stretch their product and maximize profits. The methamphetamine tested positive for the presence of methamphetamine.

[6] The Oxycodone and Xanax found in his backpack and in his residence have not been tested, but based on the characteristics of the pills, containers in which they were found, and the officers' training, it is believed that they will come back as positive.

## LEGAL STANDARD

Under the Bail Reform Act of 1984, the Court must detain a defendant before trial without bail where "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person in the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk; the government need not prove that both factors are present. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence, but a finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Id*. "[T]he Bail Reform Act mandates an [1] individualized evaluation [2] guided by the factors articulated in § 3142(g)." *See United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Categorical grants or denials of bail, not tethered to an individualized determination, are impermissible. *Id*. Consideration of factors outside the articulated factors set forth in Section 3142 is also disfavored. *Id*.

Where there is probable cause that a defendant has violated the Controlled Substances Act and faces a maximum of 10 years in person or more (as here), courts apply a rebuttal presumption against the defendant that no condition or combination of conditions reasonably will assure the defendant's appearance and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A). Under this scheme, the burden of production then shifts to the defendant. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). Although the presumption is rebuttal, it is not a "bursting bubble." *United States v. Jessup*, 757 F.2d 378, 382-383 (1st Cir. 1985) (Breyer, J.), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990). In other words, the presumption is not so weak that if a defendant introduces evidence, "the presumption 'bursts' and totally disappears, allowing the judge (or jury) to decide the question without reference to the presumption." *Id*. (further stating that such an approach would "render the presumption virtually meaningless" because a defendant can "always provide the magistrate with *some* reason" (emphasis added)). Even if the defendant rebuts the presumption, the presumption is not erased; instead, it remains in the case as an evidentiary finding militating against release that is to be weighted along with other relevant factors. *See United States v. King*, 849 F.2d 485 (11th Cir. 1988); *accord United States v. Ward*, 63 F. Supp. 2d 1203, 1209 (C.D. Cal. 1999) (citing *Jessup*, 757 F.2d at 389).

If the court concludes that the defendant has rebutted the statutory presumption of detention, the court must consider four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

## ARGUMENT

The defendant is subject to a presumption in favor of detention, which he cannot overcome. To the contrary, the defendant has an incentive to continue his unlawful business dealing narcotics or flee to Honduras, his home country.

### I.     The Defendant Is Subject to a Presumption in Favor of Detention

The defendant is charged with two violations of 21 U.S.C. § 841(a)(1) and (b)(1)(C) for distribution of fentanyl and methamphetamine, each of which carries a maximum penalty of 20 years' imprisonment, and two violations of 21 U.S.C. § 841(a)(1) and (b)(1)(B) for distribution of fentanyl and methamphetamine, each of which carries a maximum penalty of 40 years' imprisonment. Because the defendant is alleged to have violation the Controlled Substances Act and the maximum penalty is greater than 10 years' imprisonment, the defendant is subject to a rebuttable presumption in favor of detention. *See* 18 U.S.C. § 3142(e)(3)(A). To overcome this presumption, the defendant bears the burden to prove *both* that he is not a flight risk *and* that his release will not endanger the community. He cannot do so.

### II.    The Defendant Poses a Danger to the Community

The record demonstrates that the defendant poses a danger to the community. As set forth above, he appears to make his living by selling narcotics, including significant quantities of fentanyl—a drug that has wreaked havoc on San Francisco residents. He does so notwithstanding the fact that he has been arrested numerous times on narcotics related charges and is on state probation. *See United States v. Fulgham*, 2012 WL 2792439, at *4 (N.D. Cal. July 9, 2012) (finding defendant posed a danger to the

community when he "has been arrested and convicted of fraud and drug related offenses similar to the instant offense, and has committed these offenses while on parole or probation, showing an ongoing pattern of criminal conduct."). The defendant's "continuing involvement with the distribution of drugs" militates in favor of detention. *United States v. Wolf*, 2015 WL 4573039, at *3 (N.D. Cal. July 29, 2015); *see also Fulgham*, 2012 WL 2792439, at *4 ("The Senate Report states: The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the safety of any other person or the community. Defendant's tendency to repeatedly commit similar crimes shows that he poses an unmitigable danger to the community.") (quotation marks and citation omitted).

Here, it is clear that the defendant is engaged in a pattern of ongoing narcotics trafficking. The government believes that the defendant has been in the United States since approximately 2011. Beginning in 2012, he has been arrested ten times on drug related charges (and three times on other charges). Additionally, since October 2022 the defendant has sold or planned to sell narcotics (methamphetamine and fentanyl) to undercover officers on four separate occasions. The defendant has sold or planned to sell a combined total of 222.82 grams (a mix of net and gross) of methamphetamine and 228.34 grams (a mix of net and gross) of fentanyl. This does not include the 130.55 grams (gross) of fentanyl found in his apartment, or the 221.5 grams (gross) of Oxycodone pills or 409.3 grams (gross) of Xanax pills found in his backpack and apartment. Thus, in the last seven weeks alone, the defendant has been caught with approximately 2.67 pounds (gross) of narcotics. His past behavior indicates that he is engaged in a pattern of ongoing criminal conduct that will continue if he is released.

### III. The Defendant Is a Flight Risk

The defendant poses a significant flight risk for three reasons. First, the defendant has demonstrated a clear disregard for court orders and it is clear that the defendant cannot be trusted to obey court orders given the fact that he was on probation at the time of the instant offense.[7] *See, e.g.*, *United States v. Davis,* No. CR-13-0130 YGR KAW, 2013 WL 1195694, at *3 (N.D. Cal. Mar. 21, 2013) (finding violations of parole can support risk of flight); *United States v. Atikilty*, No. CR1300256PJHKAW, 2013 WL 3369315, at *2 (N.D. Cal. July 5, 2013) (finding that a history of probation and parole violations,

---

[7] The defendant's rap sheet also indicates that he was arrested for failure to obey a juvenile court order (2015) and four times for contempt of court (2015, 2015, 2018, 2019).

some of which resulted in additional jail time, indicate that defendant "is not amenable to community supervision").

Second, the defendant has demonstrated a willingness to evade the law enforcement in order to avoid taking responsibility for his criminal conduct. The defendant was arrested three separate times for obstructing the police (2014, 2015, 2018) and once for presenting false identification to police (2013), thus indicating he does not have a track record of obeying lawful authority and making him a flight risk. *See e.g.*, *United States v. Murrington*, No. CR 13-70444-MAG KAW, 2013 WL 2443260, at *4 (N.D. Cal. June 4, 2013) (finding defendant was a flight risk when, among other things, defendant had previous convictions for attempting to evade arrest and obstruct an executive office); *United States v. Alfonso Ramos*, No. 320MJ71799MAG1EJD, 2020 WL 7714535, at *4 (N.D. Cal. Dec. 29, 2020) (finding defendant was flight risk, in part, because he was arrested at least three times for resisting or obstructing a police officer). There is a substantial risk that the defendant will refuse to abide by any court-ordered conditions of release and flee.

Third, the defendant is a Honduran citizen who is in the United States illegally and has an outstanding removal order, imposed in absentia in November 2019. Given the serious consequences the defendant is facing here—a mandatory minimum of 5 years' imprisonment and up to 40 years—the defendant has every incentive to flee to his home country and avoid prosecution. There is thus a substantial risk that the defendant will refuse to abide by any court-ordered conditions of release and flee.

## CONCLUSION

No conditions of release will assure the safety of the community or the defendant's appearance at future court hearings. The Court should grant the government's motion to detain the defendant pending trial.

DATED: December 1, 2022                     Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney


*/s/ Kelsey C. Davidson*
KELSEY C. DAVIDSON
Assistant United States Attorney